IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WESTERN ENERGY COMPANY<br>P.O. Box 99<br>138 Rosebud Lane,<br>Colstrip, MT 59323<br><br>    Plaintiff,<br><br> v.<br><br>DIRK KEMPTHORNE,<br> Secretary, United States<br> Department of the Interior<br>1849 C Street, N.W.<br>Washington, D.C. 20240<br><br>C. STEPHEN ALLRED,<br> Assistant Secretary, Land and<br> Minerals Management,<br> U.S. Department of the Interior<br>1849 C Street, N.W.<br>Washington, D.C. 20240<br><br>RANDALL B. LUTHI,<br> Director, Minerals Management<br> Service<br> U.S. Department of the Interior<br>1849 C Street, N.W.<br>Washington, D.C. 20240<br><br>UNITED STATES DEPARTMENT<br> OF THE INTERIOR<br>1849 C Street, N.W.<br>Washington, D.C. 20240<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

For its complaint, Plaintiff Western Energy Company ("Western Energy") states as follows:

## NATURE OF THE ACTION

1. Plaintiff brings this civil action pursuant to 28 U.S.C. §§ 2201 and 2202 seeking a declaratory judgment and injunctive relief against the Department of the Interior ("Department"), its Secretary, Dirk Kempthorne, its Assistant Secretary for Land and Minerals Management, C. Stephen Allred, and its Director, Minerals Management Service ("MMS"), Randall B. Luthi. Plaintiff challenges the September 12, 2007 final decision of the Interior Board of Land Appeals ("IBLA") in *Western Energy Company*, IBLA 2005-241, 172 IBLA 258 ("IBLA Decision"), which affirmed a March 30, 2005 determination by the MMS Associate Director for Policy and Management Improvement ("Associate Director's Decision"), that upheld in part, and rescinded in part, two MMS orders to pay additional royalties dated September 23, 2002 (Docket No. MMS-02-0092-COAL), and January 27, 2003 (Docket No. MMS-03-0022-COAL) ("MMS Orders"). The MMS Orders, affirmed by the Associate Director and made final by the IBLA Decision, require Plaintiff to treat payments it received for the transportation of coal (after the point of sale and after the coal had already been placed in marketable condition) as part of its gross proceeds from the sale of coal and to pay additional royalties accordingly.

## PARTIES

2. Plaintiff Western Energy is a Montana corporation and the holder of record title to Bureau of Land Management ("BLM") Coal Lease No. BLM Lease MTM-073109, BLM Lease MTM-054712, BLM Lease MTM-082186, and BLM Lease MTM-080697. Western Energy is affected by the IBLA Decision and underlying MMS Orders regarding royalty on transportation revenues.

{S0313108.1}  2

3. Sued in his official capacity, Dirk Kempthorne is the Secretary of the Department of the Interior.

4. Sued in his official capacity, C. Stephen Allred is the Assistant Secretary, Land and Minerals Management, Department of the Interior.

5. Sued in his official capacity, Randall B. Luthi is the Director, Minerals Management Service, Department of the Interior.

6. The Department of the Interior is an executive department of the government of the United States of America.

## JURISDICTION

7. The United States has consented to this action under 5 U.S.C. §§ 701 through 706. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 2201.

## VENUE

8. Venue is proper in this district because the Defendants reside and may be found here. 28 U.S.C. § 1391(e).

## FACTUAL BACKGROUND

9. In 1959, the Montana Power Company purchased the Rosebud Mining Complex ("Rosebud"), 130 miles East of Billings, Montana, to produce coal for future electric generating plants and for sales to third parties. Western Energy was formed in 1966 to operate the Rosebud Mining Complex. Westmoreland Mining LLC, the parent of Western Energy, purchased the stock of Western Energy and the Rosebud assets from Montana Power in April 2001.

10. In the early 1970s, a group of electric generating companies ("Colstrip Participants" or "Buyers") began to develop a proposal for two new generation plants near the Rosebud Mining Complex to be designated as Colstrip Units 3 and 4. Construction and

operation of the Colstrip Units 3 and 4 required a dependable supply of coal of specified quality and characteristics for the life of the plant.

11.   After negotiations and three letters of intent, the Colstrip Participants and Western Energy entered into binding arbitration to establish some of the terms and conditions of a coal supply agreement (including the sales price for the coal, the point of delivery, and responsibility for transportation of coal beyond the point of delivery to the Buyers). The Arbitration Opinion issued July 2, 1980 ("Arbitration Opinion"), determined, among other things, that the point of delivery by Western Energy to the Buyers "will be equivalent to or f.o.b. belt at the eastern boundary of Area C" and that the Buyers have responsibility for the transportation of their coal from the point of delivery. Area C is a separately permitted mine within the Rosebud Complex pursuant to Montana Department of Environmental Quality Permit No. SMP 85003C ("Area C Mine").

12.   Western Energy and the Buyers negotiated a Coal Supply Agreement effective July 2, 1980, as amended as of July 10, 1981("Coal Supply Agreement"), which was consistent with the Arbitration Opinion. Section 4.4 of the Coal Supply Agreement provides that "delivery . . . of coal to Buyers will be f.o.b. belt or equivalent to f.o.b. belt at the eastern boundary of Area C." The Coal Supply Agreement does not provide for the transportation of the coal by Western Energy to any point beyond the point of delivery to Buyers and does not include cost components for transportation beyond the point of delivery.

13.   The MMS has determined that the Coal Supply Agreement is an arm's-length contract with a competitively bargained for fair market price and that the coal sold thereunder is in marketable condition at the delivery point where it is received and weighed for billing purposes by Buyers.

14. The coal reserves from Rosebud's Area C Mine were dedicated to the Coal Supply Agreement and are the only coal reserves from which the Coal Supply Agreement is sourced. The Area C Mine coal reserves include coal produced from four BLM leases: BLM Lease MTM-073109, effective September 1, 1966; BLM Lease MTM-054712, effective 1982; BLM Lease MTM-082186, effective December 22, 1992; and BLM Lease MTM-080697, effective October 1, 1999 (collectively, the "Federal Leases").

15. The run of mine coal produced from the Area C Mine is not in marketable condition as produced. The coal is hauled by truck to the coal processing facilities located at the eastern boundary of the Area C Mine where it is processed through primary and secondary crushers. Once placed in marketable condition at the end of the crushing process, the coal is weighed by a belt scale for billing and production measurement purposes. The coal is delivered by Western Energy to the Buyers or their representatives at the arm's-length f.o.b. point of sale, where title transfers and production and royalty is measured. Buyers are responsible for transportation or disposition of coal production once it has been received by Buyers or their representatives at the point of delivery.

16. The Buyers chose an overland conveyor system, rather than truck or railroad haulage, as the most economical alternative for transporting coal from the contractual point of delivery to Colstrip Units 3 and 4. After initially declining, Western Energy ultimately agreed to undertake the transportation function for Buyers. By agreement effective July 10, 1981, over a year after the execution of the Coal Supply Agreement, Western Energy agreed to construct, own, operate, and maintain the conveyor system to transport Buyers' coal from the point of delivery at the eastern edge of the Area C Mine, where the coal had been delivered in marketable condition,

to Colstrip Units 3 and 4 ("Coal Transportation Agreement"). The MMS has determined that the Coal Transportation Agreement is an arm's-length contract.

17.     The Coal Supply Agreement had been executed more than a year prior to the Coal Transportation Agreement and before the Buyers had determined the form of transportation to be used or selected an entity to perform the transportation function. No part of the negotiated compensation for transportation relates to the value of coal produced and sold by Western Energy to the Buyers pursuant to the Coal Supply Agreement. The price for coal production and the delivery point for coal sold to Buyers were both established by the Coal Supply Agreement and neither of those terms was changed by the subsequent Coal Transportation Agreement.

18.     The Mineral Lands Leasing Act of 1920 ("MLLA"), as amended by the Federal Coal Leasing Amendments Act of 1976 ("FCLAA"), requires coal lessees on federal land to pay royalty based on a percentage of the "value" of "coal recovered" from mining operations. 30 U.S.C. § 207(a). The BLM regulations promulgated to implement the leasing statutes similarly provide that royalty shall be a percentage of the "value of coal removed from a surface mine." 43 C.F.R. § 3473.3-2(a) (1). Neither the MLLA nor BLM regulations provide for royalty on the value of transportation beyond the point of sale, of coal in marketable condition.

19.     The MMS regulations provide, with respect to coal produced from ad valorem leases, that "[t]he *value of coal* that is sold pursuant to an arm's-length contract shall be the *gross proceeds accruing to the lessee* . . . ." 30 C.F.R. 206.257(b) (1) (emphasis added). Gross Proceeds, for MMS royalty purposes, means total consideration "accruing to a coal lessee *for the production and disposition of the coal produced.*" *Id.* at 206.251(emphasis added). The value of production "*shall not include payments* received . . . [that] were *not* part of the total consideration *paid for the purchase of coal production.*" *Id.* at (b) (5) (emphasis added).

20. The MMS regulations also provide that "[i]f the specific provisions of any . . . *coal lease* . . . are *inconsistent with any regulation* in this subpart then the . . . *lease provision* . . . *shall govern* to the extent of that inconsistency." *Id.* at 206.250(b) (emphasis added). The Federal Leases in the Area C Mine dedicated to the Coal Supply Agreement each provide that royalty will be based on a percent of the "value of coal." The Lease and the requirements of applicable statutes and BLM and MMS regulations are that royalty is based on the gross proceeds received for the sale of coal and nothing else.

21. Pursuant to the Coal Supply Agreement, Western Energy transports coal to the eastern edge of the Area C Mine where it is placed in marketable condition and delivered to the Buyers or their representatives at the arm's-length f.o.b. point of sale. Title of the coal production is transferred and production and royalty are measured at the point of delivery and sale.

22. Western Energy paid royalty on the Federal Leases during the time periods covered by the challenged orders based on the value of coal produced as measured by the gross proceeds from the arm's-length sale of coal in marketable condition at the contractual point of delivery and point of measurement for royalty purposes and transfer of title, as required by statute, BLM and MMS regulations, and its leases.

23. On September 23, 2002, the MMS issued Western Energy an Order to Pay Additional Royalties of $3,184,724.85, plus interest, for the audit period October 1, 1991, through December 31, 1995 ("2002 MMS Order"). The 2002 MMS Order held that revenue received by Western Energy for the transportation, after the sale and transfer of coal in marketable condition to the Buyers, was royalty bearing as part of the gross proceeds received for the sale of coal production because Western Energy did not meet the requirements for a

transportation allowance pursuant to 30 C.F.R. § 206.257. The transportation allowance provision only applies to sales where value is determined away from the lease and not to the sale from Western Energy to Buyers at the boundary of the Area C Mine. On October 22, 2002, Western Energy appealed the 2002 Letter Order to the Director of the MMS which was docketed Appeal Docket No. MMS-02-0092-COAL.

24. On January 27, 2003, the MMS issued Western Energy an Order to Pay Additional Royalties of $3,830.043.50, plus interest, for the audit period January 1, 1996, through December 31, 2001 ("2003 MMS Order"). The 2003 MMS Order held that revenue received by Western Energy for the transportation, after the sale and transfer of coal in marketable condition to the Buyers, was royalty bearing as part of the gross proceeds received for the sale of coal production because Western Energy did not meet the requirements for a transportation allowance pursuant to 30 C.F.R. § 206.257. The 2003 MMS Order also determined that the mode of transportation selected by Buyers, an overland conveyor, was a "necessary mining operation to place the coal in marketable condition." The coal that was transferred to Buyers at the point of delivery was in marketable condition. On February 24, 2003, Western Energy appealed the 2003 MMS Order to the Director of the MMS which was docketed Appeal Docket No. MMS-03-0022-COAL.

25. The MMS consolidated the appeals in Docket Nos. MMS-02-0092-COAL and MMS-03-0022-COAL and the MMS Associate Director for Policy and management Improvement issued a Decision on March 28, 2005 ("Associate Director's Decision"), which denied in part and granted in part Western Energy's appeals. The Associate Director's Decision denied Western Energy's appeal by upholding the MMS Orders' ruling that the revenue received by Western Energy for the transportation, after the sale and transfer of coal in marketable

condition to the Buyers, was royalty bearing as part of the gross proceeds received for the sale of coal production because Western Energy did not meet the requirements for a transportation allowance pursuant to 30 C.F.R. § 206.257 and because the "movement of coal within the vicinity of the mine and permit area is inherently part of the obligation assumed by the lessee to produce coal and operate the mine." The Associate Director's Decision granted Western Energy's appeal in the 2002 MMS Order and rescinded the portion of the royalty assessment that applied to the period before September 23, 2002. Western Energy appealed the Associate Director's Decision to the IBLA in IBLA 2005-241.

26. On September 12, 2007, the IBLA upheld the Associate Director's Decision in *Western Energy*. The IBLA Decision rejected Western Energy's argument that transportation revenue should be excluded from gross proceeds because it was derived from a separate contractual and business transaction and agreed with the Associate Director's Decision that transportation in the vicinity of the mine is a mining operation that is the obligation of the lessee and does not qualify for a transportation allowance pursuant to 30 C.F.R. § 206.257.

## COUNT I

27. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 26 above.

28. The IBLA Decision (affirming the Associate Director's Decision upholding the MMS Orders) is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, beyond the scope of the Secretary's authority under relevant statutes, and has been issued in a manner not in accordance with law. Specifically, the IBLA Decision is contrary to the Mineral Lands Leasing Act of 1920, 30 U.S.C. § 207(a) which provides that royalty on federal coal leases will be based on the value of coal as it is removed from the Lease by

production, rather than the value of coal production plus the value of transportation to the ultimate destination for such coal.

## COUNT II

29. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 28 above.

30. The IBLA Decision (affirming the Associate Director's Decision upholding the MMS Orders) is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, beyond the scope of the Secretary's authority under relevant statutes, and has been issued in a manner not in accordance with law. Specifically, the IBLA Decision is contrary to Western Energy's Federal Leases which provide that production royalty be based on the value of coal, not on the value of coal plus the value of transportation to the ultimate destination for such coal.

## COUNT III

31. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 30 above.

32. The IBLA Decision (affirming the Associate Director's Decision upholding the MMS Orders) is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, beyond the scope of the Secretary's authority under relevant statutes, and has been issued in a manner not in accordance with law. Specifically, the IBLA Decision is contrary to 43 C.F.R. § 3473.3-2(a) (1) which provides that royalty shall be a percentage of the value of coal removed from a surface mine, rather than the value of coal removed from a surface production plus the value of transportation to the ultimate destination for such coal.

## COUNT IV

33. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 32 above.

34. The IBLA Decision (affirming the Associate Director's Decision upholding the MMS Orders) is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, beyond the scope of the Secretary's authority and has been issued in a manner not in accordance with law. Specifically, the IBLA Orders are contrary to 30 C.F.R. 206.257(b) (1) which provides that the value of coal produced from ad valorem leases will be the gross proceeds from the production and disposition of coal produced and shall not include payments received that were not part of the total consideration paid for the purchase of coal production.

## COUNT V

35. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 34 above.

36. The IBLA Decision (affirming the Associate Director's Decision upholding the MMS Orders) is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, beyond the scope of the Secretary's authority and has been issued in a manner not in accordance with the law because there is no basis for the determination that Western Energy must include revenue received for transportation services as part of gross proceeds, merely because it did not meet the criteria for a transportation allowance pursuant 30 C.F.R.§ 206.261(a) which is inapplicable to sales at the mine.

## COUNT VI

37. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 36 above.

38.   The IBLA Decision (affirming the Associate Director's Decision upholding the MMS Orders) is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, beyond the scope of the Secretary's authority and has been issued in a manner not in accordance with the law because there is no basis for the determination that transportation beyond the arm's-length f.o.b. point of sale to Buyers, where coal is in marketable condition and where title transfers and production and royalty are measured, is part of mining operations that are the obligation of the lessee to perform at no cost to lessor.

## COUNT VII

39.   Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 38 above.

40.   The IBLA Decision (affirming the Associate Director's Decision upholding the MMS Orders) is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, beyond the scope of the Secretary's authority and has been issued in a manner not in accordance with the law because there is no basis for the determination that the arm's-length Coal Supply Agreement and the arm's-length Coal Transportation Agreement, executed more that a year later, are not separate contractual business transactions.

## COUNT VIII

41.   Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 40 above.

42.   The IBLA Decision (affirming the Associate Director's Decision upholding the MMS Orders) is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, beyond the scope of the Secretary's authority and has been issued in a manner not in

accordance with the law because there is no basis for the determination that the coal delivered to Buyers at the point of delivery is not in marketable condition.

## COUNT IX

43. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 42 above.

44. The IBLA Decision (affirming the Associate Director's Decision upholding the MMS Orders) is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, beyond the scope of the Secretary's authority and has been issued in a manner not in accordance with the law because there is no basis for the determination that coal is not in marketable condition until it reaches Colstrip Units 3 and 4.

## COUNT X

45. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 44 above.

46. The IBLA Decision (affirming the Associate Director's Decision upholding the MMS Orders) is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, beyond the scope of the Secretary's authority and has been issued in a manner not in accordance with the law because there is no basis for the determination that the proceeds for transportation beyond the point where coal has been placed in marketable condition and delivered to Buyers or Buyers' representative onto Buyers chosen alternative for further transportation is part of the gross proceeds associated with the production and distribution of coal.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully request that the Court: (1) reverse the IBLA Order; (2) enter a declaratory judgment that the 2002 MMS Order and 2003 MMS Order (affirmed by

the Associate Director's Decision and made final by the IBLA Decision) are unlawful and of no force or effect; (3) enter an injunction prohibiting the Defendants from enforcing the 2002 MMS Order and 2003 MMS Order, the Associate Director's Decision, the IBLA Decision, and all similar orders with the same effect, for past and future periods; and (4) award Plaintiff its costs, attorneys' fees, expert witness fees, and such other relief as the Court deems just and proper.

Respectfully submitted,
WESTERN ENERGY COMPANY

By Counsel

_____
JOHN K. MCDONALD
D.C. Bar No. 304642
THAD S. HUFFMAN
D.C. Bar No. 424541
JACKSON KELLY PLLC
2401 Pennsylvania Avenue, N.W.
Suite 400
Washington, D.C. 20037
(202) 973-0200

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

WESTERN ENERGY COMPANY

## DEFENDANTS

DIRK KEMPTHORNE, Secretary, U.S. Department of the Interior, C. STEPHEN ALLRED, Assistant Secretary, U.S. Department of the Interior, RANDALL B. LUTHI, Director, Minerals Management Service, U.S. Departmemt of the Interior, U.S. DEPARTMENT OF THE INTERIOR

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  88888
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY) _____
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

John K. McDonald
JACKSON KELLY PLLC, 2401 Pennsylvania Ave. NW, Suite 400, Washington DC 20037 (202) 973-0200

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)
● 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A.** *Antitrust*

☐ 410 Antitrust

○ **B.** *Personal Injury/Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

● **C.** *Administrative Agency Review*

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☒ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D.** *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E.** *General Civil (Other)* OR ○ **F.** *Pro Se General Civil*

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
- ● 1 Original Proceeding
- ○ 2 Removed from State Court
- ○ 3 Remanded from Appellate Court
- ○ 4 Reinstated or Reopened
- ○ 5 Transferred from another district (specify)
- ○ 6 Multi district Litigation
- ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Judicial review of final agency action under APA, 5 U.S.C. Sec., 701 et seq

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 ☐   DEMAND $ NONE   JURY DEMAND: YES ☐   NO ☒   Check YES only if demanded in complaint

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE 12/12/2007   SIGNATURE OF ATTORNEY OF RECORD *[signature]*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.