IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WESTERN ENERGY COMPANY,<br><br>        Plaintiff,<br><br>v.<br><br>DIRK KEMPTHORNE, et al.,<br><br>        Defendants. | Civil Action No. 1:07-cv-2237 (RCL) |

### FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

For its first amended complaint, Plaintiff Western Energy Company ("Western Energy") states as follows:

### NATURE OF THE ACTION

1. Plaintiff brings this civil action pursuant to 28 U.S.C. §§ 2201 and 2202 seeking a declaratory judgment and injunctive relief against the Department of the Interior ("Department"), its Secretary, Dirk Kempthorne, its Assistant Secretary for Land and Minerals Management, C. Stephen Allred, and its Director, Minerals Management Service ("MMS"), Randall B. Luthi. Plaintiff challenges: (i) the September 12, 2007 final decision of the Interior Board of Land Appeals ("IBLA") in *Western Energy Company*, IBLA 2005-241, 172 IBLA 258 ("IBLA Decision"), which affirmed a March 30, 2005 determination by the MMS Associate Director for Policy and Management Improvement ("Associate Director's Decision"), that upheld in part, and rescinded in part, two MMS orders to pay additional royalties dated September 23, 2002 (Docket No. MMS-02-0092-COAL), and January 27, 2003 (Docket No. MMS-03-0022-COAL) ("MMS

Orders"): and (ii) the March 26, 2008 decision issued by the Assistant Secretary for Land and Minerals Management, which denied Plaintiff's appeal of and affirmed a September 26, 2006 MMS order to pay additional royalties (Docket No. MMS-06-0056-COAL). The MMS Orders, affirmed by the Associate Director and made final by the IBLA Decision, and the MMS Order affirmed and made final by the Assistant Secretary's Decision, require Plaintiff to treat payments it received for the transportation of coal (after the point of sale and after the coal had already been placed in marketable condition) as part of its gross proceeds from the sale of coal and to pay additional royalties accordingly.

## PARTIES

2.   Plaintiff Western Energy is a Montana corporation and the holder of record title to Bureau of Land Management ("BLM") Coal Lease No. BLM Lease MTM-073109, BLM Lease MTM-054712, BLM Lease MTM-082186, and BLM Lease MTM-080697. Western Energy is affected by the IBLA Decision and underlying MMS Orders regarding royalty on transportation revenues.

3.   Sued in his official capacity, Dirk Kempthorne is the Secretary of the Department of the Interior.

4.   Sued in his official capacity, C. Stephen Allred is the Assistant Secretary, Land and Minerals Management, Department of the Interior.

5.   Sued in his official capacity, Randall B. Luthi is the Director, Minerals Management Service, Department of the Interior.

6.   The Department of the Interior is an executive department of the government of the United States of America.

## JURISDICTION

7. The United States has consented to this action under 5 U.S.C. §§ 701 through 706. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 2201.

## VENUE

8. Venue is proper in this district because the Defendants reside and may be found here. 28 U.S.C. § 1391(e).

## FACTUAL BACKGROUND

9. In 1959, the Montana Power Company purchased the Rosebud Mining Complex ("Rosebud"), 130 miles East of Billings, Montana, to produce coal for future electric generating plants and for sales to third parties. Western Energy was formed in 1966 to operate the Rosebud Mining Complex. Westmoreland Mining LLC, the parent of Western Energy, purchased the stock of Western Energy and the Rosebud assets from Montana Power in April 2001.

10. In the early 1970s, a group of electric generating companies ("Colstrip Participants" or "Buyers") began to develop a proposal for two new generation plants near the Rosebud Mining Complex to be designated as Colstrip Units 3 and 4. Construction and operation of the Colstrip Units 3 and 4 required a dependable supply of coal of specified quality and characteristics for the life of the plant.

11. After negotiations and three letters of intent, the Colstrip Participants and Western Energy entered into binding arbitration to establish some of the terms and conditions of a coal supply agreement (including the sales price for the coal, the point of delivery, and responsibility for transportation of coal beyond the point of delivery to the Buyers). The Arbitration Opinion issued July 2, 1980 ("Arbitration Opinion"), determined, among other things, that the point of delivery by Western Energy to the Buyers "will be equivalent to or f.o.b. belt at the eastern

boundary of Area C" and that the Buyers have responsibility for the transportation of their coal from the point of delivery. Area C is a separately permitted mine within the Rosebud Complex pursuant to Montana Department of Environmental Quality Permit No. SMP 85003C ("Area C Mine").

12. Western Energy and the Buyers negotiated a Coal Supply Agreement effective July 2, 1980, as amended as of July 10, 1981("Coal Supply Agreement"), which was consistent with the Arbitration Opinion. Section 4.4 of the Coal Supply Agreement provides that "delivery . . . of coal to Buyers will be f.o.b. belt or equivalent to f.o.b. belt at the eastern boundary of Area C." The Coal Supply Agreement does not provide for the transportation of the coal by Western Energy to any point beyond the point of delivery to Buyers and does not include cost components for transportation beyond the point of delivery.

13. The MMS has determined that the Coal Supply Agreement is an arm's-length contract with a competitively bargained for fair market price and that the coal sold thereunder is in marketable condition at the delivery point where it is received and weighed for billing purposes by Buyers.

14. The coal reserves from Rosebud's Area C Mine were dedicated to the Coal Supply Agreement and are the only coal reserves from which the Coal Supply Agreement is sourced. The Area C Mine coal reserves include coal produced from four BLM leases: BLM Lease MTM-073109, effective September 1, 1966; BLM Lease MTM-054712, effective 1982; BLM Lease MTM-082186, effective December 22, 1992; and BLM Lease MTM-080697, effective October 1, 1999 (collectively, the "Federal Leases").

15. The run of mine coal produced from the Area C Mine is not in marketable condition as produced. The coal is hauled by truck to the coal processing facilities located at the

eastern boundary of the Area C Mine where it is processed through primary and secondary crushers. Once placed in marketable condition at the end of the crushing process, the coal is weighed by a belt scale for billing and production measurement purposes. The coal is delivered by Western Energy to the Buyers or their representatives at the arm's-length f.o.b. point of sale, where title transfers and production and royalty is measured. Buyers are responsible for transportation or disposition of coal production once it has been received by Buyers or their representatives at the point of delivery.

16. The Buyers chose an overland conveyor system, rather than truck or railroad haulage, as the most economical alternative for transporting coal from the contractual point of delivery to Colstrip Units 3 and 4. After initially declining, Western Energy ultimately agreed to undertake the transportation function for Buyers. By agreement effective July 10, 1981, over a year after the execution of the Coal Supply Agreement, Western Energy agreed to construct, own, operate, and maintain the conveyor system to transport Buyers' coal from the point of delivery at the eastern edge of the Area C Mine, where the coal had been delivered in marketable condition, to Colstrip Units 3 and 4 ("Coal Transportation Agreement"). The MMS has determined that the Coal Transportation Agreement is an arm's-length contract.

17. The Coal Supply Agreement had been executed more than a year prior to the Coal Transportation Agreement and before the Buyers had determined the form of transportation to be used or selected an entity to perform the transportation function. No part of the negotiated compensation for transportation relates to the value of coal produced and sold by Western Energy to the Buyers pursuant to the Coal Supply Agreement. The price for coal production and the delivery point for coal sold to Buyers were both established by the Coal Supply Agreement and neither of those terms was changed by the subsequent Coal Transportation Agreement.

18.  The Mineral Lands Leasing Act of 1920 ("MLLA"), as amended by the Federal Coal Leasing Amendments Act of 1976 ("FCLAA"), requires coal lessees on federal land to pay royalty based on a percentage of the "value" of "coal recovered" from mining operations. 30 U.S.C. § 207(a). The BLM regulations promulgated to implement the leasing statutes similarly provide that royalty shall be a percentage of the "value of coal removed from a surface mine." 43 C.F.R. § 3473.3-2(a) (1). Neither the MLLA nor BLM regulations provide for royalty on the value of transportation beyond the point of sale, of coal in marketable condition.

19.  The MMS regulations provide, with respect to coal produced from ad valorem leases, that "[t]he *value of coal* that is sold pursuant to an arm's-length contract shall be the *gross proceeds accruing to the lessee* . . . ." 30 C.F.R. 206.257(b) (1) (emphasis added). Gross Proceeds, for MMS royalty purposes, means total consideration "accruing to a coal lessee *for the production and disposition of the coal produced*." *Id.* at 206.251(emphasis added). The value of production "*shall not include payments* received . . . [that] were *not* part of the total consideration *paid for the purchase of coal production*." *Id.* at (b) (5) (emphasis added).

20.  The MMS regulations also provide that "[i]f the specific provisions of any . . . *coal lease* . . . are *inconsistent with any regulation* in this subpart then the . . . *lease provision* . . . *shall govern* to the extent of that inconsistency." *Id.* at 206.250(b) (emphasis added). The Federal Leases in the Area C Mine dedicated to the Coal Supply Agreement each provide that royalty will be based on a percent of the "value of coal." The Lease and the requirements of applicable statutes and BLM and MMS regulations are that royalty is based on the gross proceeds received for the sale of coal and nothing else.

21.  Pursuant to the Coal Supply Agreement, Western Energy transports coal to the eastern edge of the Area C Mine where it is placed in marketable condition and delivered to the

Buyers or their representatives at the arm's-length f.o.b. point of sale. Title of the coal production is transferred and production and royalty are measured at the point of delivery and sale.

22. Western Energy paid royalty on the Federal Leases during the time periods covered by the challenged orders based on the value of coal produced as measured by the gross proceeds from the arm's-length sale of coal in marketable condition at the contractual point of delivery and point of measurement for royalty purposes and transfer of title, as required by statute, BLM and MMS regulations, and its leases.

23. On September 23, 2002, the MMS issued Western Energy an Order to Pay Additional Royalties of $3,184,724.85, plus interest, for the audit period October 1, 1991, through December 31, 1995 ("2002 MMS Order"). The 2002 MMS Order held that revenue received by Western Energy for the transportation, after the sale and transfer of coal in marketable condition to the Buyers, was royalty bearing as part of the gross proceeds received for the sale of coal production because Western Energy did not meet the requirements for a transportation allowance pursuant to 30 C.F.R. § 206.257. The transportation allowance provision only applies to sales where value is determined away from the lease and not to the sale from Western Energy to Buyers at the boundary of the Area C Mine. On October 22, 2002, Western Energy appealed the 2002 Letter Order to the Director of the MMS which was docketed Appeal Docket No. MMS-02-0092-COAL.

24. On January 27, 2003, the MMS issued Western Energy an Order to Pay Additional Royalties of $3,830.043.50, plus interest, for the audit period January 1, 1996, through December 31, 2001 ("2003 MMS Order"). The 2003 MMS Order held that revenue received by Western Energy for the transportation, after the sale and transfer of coal in

marketable condition to the Buyers, was royalty bearing as part of the gross proceeds received for the sale of coal production because Western Energy did not meet the requirements for a transportation allowance pursuant to 30 C.F.R. § 206.257. The 2003 MMS Order also determined that the mode of transportation selected by Buyers, an overland conveyor, was a "necessary mining operation to place the coal in marketable condition." The coal that was transferred to Buyers at the point of delivery was in marketable condition. On February 24, 2003, Western Energy appealed the 2003 MMS Order to the Director of the MMS which was docketed Appeal Docket No. MMS-03-0022-COAL.

25.  The MMS consolidated the appeals in Docket Nos. MMS-02-0092-COAL and MMS-03-0022-COAL and the MMS Associate Director for Policy and management Improvement issued a Decision on March 28, 2005 ("Associate Director's Decision"), which denied in part and granted in part Western Energy's appeals. The Associate Director's Decision denied Western Energy's appeal by upholding the MMS Orders' ruling that the revenue received by Western Energy for the transportation, after the sale and transfer of coal in marketable condition to the Buyers, was royalty bearing as part of the gross proceeds received for the sale of coal production because Western Energy did not meet the requirements for a transportation allowance pursuant to 30 C.F.R. § 206.257 and because the "movement of coal within the vicinity of the mine and permit area is inherently part of the obligation assumed by the lessee to produce coal and operate the mine." The Associate Director's Decision granted Western Energy's appeal in the 2002 MMS Order and rescinded the portion of the royalty assessment that applied to the period before September 23, 1995. Western Energy appealed the Associate Director's Decision to the IBLA in IBLA 2005-241.

26. On September 12, 2007, the IBLA upheld the Associate Director's Decision in *Western Energy*. The IBLA Decision rejected Western Energy's argument that transportation revenue should be excluded from gross proceeds because it was derived from a separate contractual and business transaction and agreed with the Associate Director's Decision that transportation in the vicinity of the mine is a mining operation that is the obligation of the lessee and does not qualify for a transportation allowance pursuant to 30 C.F.R. § 206.257.

27. On March 26, 2008, the Assistant Secretary for Land and Minerals Management denied Plaintiff's appeal in Docket No. MMS-06-0056-COAL and affirmed a September 26, 2006 order to pay additional royalties ("2006 MMS Order") that is factually identical to the MMS Orders affirmed by the IBLA Decision, but applied to the subsequent period, January 1, 2002, through December 31, 2004 ("Assistant Secretary Decision"). The Assistant Secretary Decision is based on the recognition that the underlying issues were fully and finally addressed in the IBLA Decision. The Assistant Secretary Decision "is not subject to appeal to the Interior Board of Land Appeals and is the final action of the Department."

## COUNT I

28. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 27 above.

29. The IBLA Decision and the Assistant Secretary Decision are arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, beyond the scope of the Secretary's authority under relevant statutes, and have been issued in a manner not in accordance with law. Specifically, the IBLA Decision and the Assistant Secretary Decision are contrary to the Mineral Lands Leasing Act of 1920, 30 U.S.C. § 207(a) which provides that royalty on federal coal leases

will be based on the value of coal as it is removed from the Lease by production, rather than the value of coal production plus the value of transportation to the ultimate destination for such coal.

## COUNT II

30. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 29 above.

31. The IBLA Decision and the Assistant Secretary Decision are arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, beyond the scope of the Secretary's authority under relevant statutes, and have been issued in a manner not in accordance with law. Specifically, the IBLA Decision and the Assistant Secretary Decision are contrary to Western Energy's Federal Leases which provide that production royalty be based on the value of coal, not on the value of coal plus the value of transportation to the ultimate destination for such coal.

## COUNT III

32. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 31 above.

33. The IBLA Decision and the Assistant Secretary Decision are arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, beyond the scope of the Secretary's authority under relevant statutes, and have been issued in a manner not in accordance with law. Specifically, the IBLA Decision and the Assistant Secretary Decision are contrary to 43 C.F.R. § 3473.3-2(a)(1) which provides that royalty shall be a percentage of the value of coal removed from a surface mine, rather than the value of coal removed from a surface production plus the value of transportation to the ultimate destination for such coal.

## COUNT IV

34. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 33 above.

35. The IBLA Decision and the Assistant Secretary Decision are arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, beyond the scope of the Secretary's authority and have been issued in a manner not in accordance with law. Specifically, the IBLA Decision and the Assistant Secretary Decision are contrary to 30 C.F.R. 206.257(b) (1) which provides that the value of coal produced from ad valorem leases will be the gross proceeds from the production and disposition of coal produced and shall not include payments received that were not part of the total consideration paid for the purchase of coal production.

## COUNT V

36. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 35 above.

37. The IBLA Decision and the Assistant Secretary Decision are arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, beyond the scope of the Secretary's authority and have been issued in a manner not in accordance with the law because there is no basis for the determination that Western Energy must include revenue received for transportation services as part of gross proceeds, merely because it did not meet the criteria for a transportation allowance pursuant 30 C.F.R.§ 206.261(a) which is inapplicable to sales at the mine.

## COUNT VI

38. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 37 above.

39.     The IBLA Decision and the Assistant Secretary Decision are arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, beyond the scope of the Secretary's authority and have been issued in a manner not in accordance with the law because there is no basis for the determination that transportation beyond the arm's-length f.o.b. point of sale to Buyers, where coal is in marketable condition and where title transfers and production and royalty are measured, is part of mining operations that are the obligation of the lessee to perform at no cost to lessor.

## COUNT VII

40.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 39 above.

41.     The IBLA Decision and the Assistant Secretary Decision are arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, beyond the scope of the Secretary's authority and have been issued in a manner not in accordance with the law because there is no basis for the determination that the arm's-length Coal Supply Agreement and the arm's-length Coal Transportation Agreement, executed more that a year later, are not separate contractual business transactions.

## COUNT VIII

42.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 41 above.

43.     The IBLA Decision and the Assistant Secretary Decision are arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, beyond the scope of the Secretary's authority and have been issued in a manner not in accordance with the law because there is no

basis for the determination that the coal delivered to Buyers at the point of delivery is not in marketable condition.

## COUNT IX

44. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 43 above.

45. The IBLA Decision and the Assistant Secretary Decision are arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, beyond the scope of the Secretary's authority and have been issued in a manner not in accordance with the law because there is no basis for the determination that coal is not in marketable condition until it reaches Colstrip Units 3 and 4.

## COUNT X

46. Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 45 above.

47. The IBLA Decision and the Assistant Secretary Decision are arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, beyond the scope of the Secretary's authority and have been issued in a manner not in accordance with the law because there is no basis for the determination that the proceeds for transportation beyond the point where coal has been placed in marketable condition and delivered to Buyers or Buyers' representative onto Buyers chosen alternative for further transportation is part of the gross proceeds associated with the production and distribution of coal.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully request that the Court: (1) reverse the IBLA Decision and the Assistant Secretary Decision; (2) enter a declaratory judgment that the 2002

MMS Order and 2003 MMS Order (affirmed by the Associate Director's Decision and made final by the IBLA Decision) and the 2006 MMS Order affirmed and made final by the Assistant Secretary Decision are unlawful and of no force or effect; (3) enter an injunction prohibiting the Defendants from enforcing the 2002 MMS Order and 2003 MMS Order, the Associate Director's Decision, the IBLA Decision, the 2006 MMS Order, the Assistant Secretary Decision, and all similar orders with the same effect, for past and future periods; and (4) award Plaintiff its costs, attorneys' fees, expert witness fees, and such other relief as the Court deems just and proper.

Respectfully submitted,
WESTERN ENERGY COMPANY

By Counsel

/s/ John K. McDonald
JOHN K. MCDONALD
D.C. Bar No. 304642
THAD S. HUFFMAN
D.C. Bar No. 424541
JACKSON KELLY PLLC
2401 Pennsylvania Avenue, N.W.
Suite 400
Washington, D.C. 20037
(202) 973-0200